IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

**UNDER SEAL**

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:17-CR-224-LOG |
| | ) | |
| | ) | Count 1: 18 U.S.C. § 1349 |
| v. | ) | (Conspiracy to Commit Health Care & |
| | ) | Wire Fraud) |
| | ) | |
| YOUNG YI | ) | Counts 2-7: 18 U.S.C. §§ 1347 & 2 |
| (Counts 1-9) | ) | (Health Care Fraud) |
| | ) | |
| and | ) | Count 8: 18 U.S.C. § 371 |
| | ) | (Conspiracy to Defraud the United States) |
| DANNIE AHN, | ) | |
| (Counts 1-8) | ) | Count 9: 26 U.S.C. § 7206(1) |
| | ) | (False Tax Return) |
| Defendants. | ) | |
| | ) | Forfeiture Notice |

**INDICTMENT**

October 2017 TERM - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

**INTRODUCTORY ALLEGATIONS**

**A. The Defendants**

1.      Defendant YOUNG YI ("YI") owned, operated, and controlled various corporations that provided sleep studies and sleep-related treatment at clinics located throughout Northern Virginia and Maryland from in or about 2005 through in or about 2014.

2.      Defendant DANNIE AHN ("AHN") helped control, oversee, and manage YI's various corporations that provided sleep studies and sleep-related treatment from in or about 2005 through in or about 2014.

### B. The Corporations

3.     YI and AHN oversaw and controlled 1st Class Sleep Diagnostic Center, Inc. ("1st Class Sleep"), a Maryland company created in or about 2004, which was registered as a foreign corporation in Virginia in or about 2008.  Between in or about 2005 through in or about 2014, 1st Class Sleep operated sleep centers in the Eastern District of Virginia and elsewhere.

4.     YI and AHN oversaw and controlled 1st Class Medical, Inc. ("1st Class Medical"), a Virginia company created in or about November 2005.  Between in or about 2005 through in or about 2014, 1st Class Medical sold and distributed durable medical equipment ("DME"), specifically, CPAP machines, masks, and other supplies.

5.     YI and AHN oversaw and controlled Quality Diagnostics, Inc. ("Quality Diagnostics"), a Maryland company created in or about 2005.  Quality Diagnostics operated sleep centers in Annapolis and other locations in Maryland.

6.     YI and AHN oversaw Quality DME, Inc. ("Quality DME"), a Virginia company created in or about 2007. Between in or about 2007 and in or about 2014, Quality DME sold and distributed CPAP machines, masks, and other supplies.  Quality DME was incorporated in the name of D.C., an employee of 1st Class Sleep, who was also listed as the company's director.  However, in truth and in fact, Quality DME was financed by YI and ultimately controlled by YI and AHN.

7.     Collectively, the various companies – 1st Class Sleep, 1st Class Medical, Quality Diagnostics, and Quality DME – will be referred to as "1st Class" in this Indictment.

8.     1st Class Sleep elected to be treated as an S Corporation for tax purposes.  In general, an S Corporation did not pay any income tax.  Instead, the corporation's income or losses were divided among and passed through to its shareholders.  The shareholders were then required

to report the income or loss on their own individual income tax returns.  YI was a shareholder for 1st Class Sleep.

9.       YI oversaw and controlled Kim & Associates ("Kim & Associates"), a Virginia company created in or about April 2009.  Kim & Associates was used to bill various health insurance companies for services actually performed by 1st Class Sleep.  Kim & Associates had no employees, no physical location, and performed no sleep services.

10.      AHN oversaw and controlled DA Billing Specialist, Inc. ("DA Billing"), a Virginia company created in or about December 2010.  DA Billing was used to bill various health care benefit programs, including for services actually performed by 1st Class Sleep. DA Billing had no employees, no physical location, and performed no sleep services.

### C. Relevant Terms

11.      Obstructive Sleep Apnea ("OSA") was a sleep disorder that caused breathing to stop and start during sleep.  One treatment that a physician or licensed medical provider could prescribe for OSA was a Continuous Positive Airway Pressure ("CPAP") machine, which a patient used while sleeping to increase the air pressure and thus keep the patient's airway open.

12.      A polysomnogram ("PSG") was a medical test used to diagnose sleep disorders, including OSA.  During a PSG, a patient was connected to various sensors that monitored and recorded physiological information about the patient's breathing, heart rate, brain waves, and blood oxygen level.  The patient was also monitored by a technician.

13.      A CPAP titration was a medical test, which typically followed a PSG. It was typically used for patients diagnosed with sleep disorders, such as OSA, to determine the medical appropriateness of using a CPAP machine to treat the disorder and to calibrate the machine with the proper settings for that patient.  During a CPAP titration, a patient used a mask and was

connected to a CPAP device, as well as to various sensors that monitored and recorded physiological information about the patient's breathing, heart rate, brain waves, and blood oxygen level.

14. A co-payment (hereinafter "co-pay") was a fixed amount that an insured patient had to pay to the provider each time the patient received a service covered by that patient's health insurance policy. The entity or individual providing the service was required to collect the co-pay.

15. Co-insurance was the percentage that an insured patient was required to pay in order to receive a service covered by that patient's health insurance policy. The entity or individual providing the service was supposed to collect the co-insurance. Co-insurance and co-pays were sometimes referred to as the "out-of-pocket expense" for that particular service and were designed, in part, to share the costs and thus prevent patients from agreeing to or seeking unnecessary services.

16. To be "in-network" meant that the provider, such as 1st Class, had a contract with a particular health insurance program, which generally meant that patients who were insured under that program paid less if they received services from that provider. Whether a particular provider was "in-network" for a particular patient depended on that patient's insurance. As part of its contract, an "in-network" provider agreed to be reimbursed by that health insurance program pursuant to an agreed upon fee schedule.

17. To be "out-of-network" meant that the provider did not have a contract with that health insurance program, which generally meant that patients who were insured under that program would have to pay more if they received services from that provider. Generally, an "out-of-network" provider was not bound by the health insurance program's fee schedule.

18.     When a provider, such as 1st Class, was "in-network" with a particular health insurance program, the provider was required to follow the terms of its written contract with that health insurance program. Among other things, such contracts could require the provider to collect co-pays and/or co-insurance from patients, to have physicians order or "refer" a patient for particular medical procedures in order to ensure that the procedures were medically necessary, and to be paid at the "in-network" rate, even if that patient's insurance covered "out of network" services.

19.     A "health care benefit program" under Section 24(b) of Title 18, United States Code, was defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." As used herein, a "health insurance program" or "health care program" means a health care benefit program.

20.     The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were over the age of 65 or disabled. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services, administered Medicare.

21.     The TRICARE Program ("TRICARE") was a federal health care program providing benefits to individuals and dependents affiliated with the United States armed forces. The Department of Defense administered TRICARE.

22.     CareFirst BlueCross BlueShield ("CareFirst"), United Healthcare, and Cigna were private health care programs that provided insurance contracts and plans, affecting interstate commerce, under which medical benefits, items, and services were provided to individuals.

5

23.     To receive payment, a provider was required to submit a claim using a CMS 1500, a Health Insurance Claim Form ("CMS 1500" or "claim form").  Claims could be submitted electronically or by mail.

24.     The CMS 1500 required information about: the date of service for the procedure, the service or supplies received, the name of the referring physician, the medical diagnosis, the place of service, and the service facility location.  As used on the CMS 1500, the "referring physician" was supposed to list the medical practitioner who actually ordered or referred the patient for the services billed on the form.  The "date of service" was supposed to list the actual date that the service was provided, which was used by the health care benefit program to ensure that the patient was eligible and covered by insurance on that date.

25.     Health care benefit programs relied upon the truth and accuracy of information on the CMS 1500 to determine whether to pay the provider for the equipment or services rendered.  By submitting a claim, the provider certified under penalty of perjury that the services or equipment were medically "indicated" and necessary.

26.     For each sleep study and each CPAP machine, health care benefit programs required a medical practitioner's referral or order (hereinafter "physician referral") in order to pay the provider for that service.  A provider, such as 1st Class, was responsible for obtaining the physician referral.

27.     The Internal Revenue Service ("IRS") was an agency of the U.S. Department of the Treasury, a department of the United States within the meaning of Title 18, United States Code, Section 6. The IRS was responsible for the ascertainment, computation, assessment, and collection of taxes, including income taxes.

### D. 1st Class Overview

28.     1st Class was organized into several different departments that were responsible for different parts of 1st Class's operations, including Scheduling, Marketing, Billing, and DME.  YI and AHN oversaw and managed all of the departments.

29.     The Scheduling department was responsible for contacting new and existing patients of 1st Class.  Employees in this department ("schedulers") tried to get patients to sign up for additional sleep studies, which were also sometimes called "retitrations," "in-house" referrals, or "1st Class refers."

30.     Employees in the Marketing department ("marketers") were responsible for soliciting medical practitioners to refer patients.

31.     Employees in the Billing department ("billers") were responsible for submitting the claims to health care benefit programs.  All billing procedures were approved by YI, and designed, in part, to intentionally cause the submission of false and fraudulent information. For example, false and fraudulent information was placed in the fields on claim forms for the diagnosis code, date of service, referring physician, and location of service.

### E. 1st Class Operations

32.     YI and AHN oversaw and directed the operations of 1st Class, including the policies and procedures followed by different departments.

33.     1st Class employees were encouraged to have sleep studies and to recruit people who had insurance for sleep studies, including family and friends, which would generally be conducted and billed to insurance without obtaining or even trying to obtain a legitimate physician referral.  YI and AHN personally encouraged many 1st Class employees to have sleep studies.  1st

Class employees received a bonus for every referral where the patient had a sleep study that could be billed to insurance.

34.     The salary of many 1st Class employees was directly tied to increasing the business of 1st Class, particularly in the Marketing and Scheduling departments. For example, schedulers received a bonus for every patient that they scheduled for an additional sleep study. Such studies generally were conducted and billed to insurance without obtaining or even trying to obtain a legitimate physician referral. Marketers received a bonus based on the number of referrals that their assigned medical practitioners made to 1st Class.

35.     YI and AHN recruited several physicians, including M.H. and Y.M., to interpret or "read" sleep studies for 1st Class (collectively, "1st Class doctors"). The 1st Class doctors did not control or otherwise oversee the day-to-day operations of 1st Class.

36.     YI and AHN approved and encouraged in-house "referral races" or "sleep races," one purpose of which was to increase the revenue for 1st Class. During referral races, 1st Class employees were paid a bonus for having a sleep study, as well as for every person with valid insurance that they referred to have a sleep study. These sleep studies were generally conducted and billed to insurance without obtaining or even trying to obtain a legitimate physician referral.

37.     With the knowledge and approval of YI and AHN, 1st Class regularly waived co-pays and co-insurance. 1st Class waived co-pays and co-insurance in order to increase business and revenue. The amount of revenue lost by waiving co-pays and co-insurance was substantially less than the amount 1st Class could bill and receive from the health care benefit programs.

38.     Patients generally received DME equipment from a 1st Class employee, including CPAP machines, immediately after their sleep study.

39.    Beginning in or about 2011, 1st Class was notified that it was being audited by Cigna, a private health care benefit program.  With the knowledge and approval of YI and AHN, bills were created showing the co-pay and/or co-insurance, which were put in patient files and sometimes mailed to patients.  The purpose of these bills was to make it appear that 1st Class was in fact collecting and attempting to collect co-pays and co-insurance.

40.    With the knowledge and approval of YI and AHN, 1st Class billed for services it performed by fraudulently using the names of other companies owned or controlled by YI and/or AHN on the claim forms, including Kim & Associates and DA Billing.

41.    To increase the revenue for 1st Class, billers were directed to and did bill out-of-network if the patient had out-of-network benefits, even if 1st Class had a contract with that health insurance company and was supposed to bill in-network under that contract.

42.    The allegations in paragraphs 1 through 41 are realleged in each Count of this Indictment as if set forth fully therein.

## COUNT 1
### (Conspiracy to Commit Health Care Fraud & Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

**I.    The Conspiracy**

43.    From a date unknown, but by at least in or about 2008 and continuing through at least in or about 2014, in the Eastern District of Virginia and elsewhere, defendants YOUNG YI and DANNIE AHN knowingly and willfully did combine, conspire, confederate and agree with each other and others known and unknown to the grand jury, to commit the following offenses against the United States:

a.    Health care fraud, that is, to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including but not limited to Medicare, TRICARE, CareFirst BlueCross BlueShield, United Healthcare, and Cigna, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, all in violation of Title 18, United States Code, Section 1347; and

b.    Wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false or fraudulent pretenses, representations, and promises, knowingly transmits and causes to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice to defraud, in violation of Title 18, United States Code, Section 1343.

10

## II.     Purposes of the Conspiracy

44.     It was a purpose of the conspiracy to enrich the conspirators by defrauding health care benefit programs by submitting, false, fraudulent, and misleading claims.

45.     It was further a purpose of the conspiracy to fraudulently induce patients to agree to and receive sleep studies and medical equipment that had not been recommended, prescribed, or otherwise authorized by a physician or licensed medical practitioner.

46.     It was further a purpose of the conspiracy to divert proceeds of the fraud for the defendants' personal use and benefit.

## III.    Manner and Means of the Conspiracy

47.     The ways, manner, and means by which the conspirators, both individually and jointly, sought to accomplish the conspiracy included, but were not limited to, those described below:

a.      Submitted and caused to be submitted approximately $200 million in claims that were, in part, based on false and misleading statements to health care benefit programs.

b.      Offered and awarded bonuses, prizes, and other financial incentives to 1st Class employees who recruited new patients to have sleep studies, which were not prescribed by any medical practitioner.

c.      Paid physicians for referring new patients.

d.      Directed 1st Class employees to solicit existing 1st Class patients, including through systematic cold calls, to undergo sleep studies not prescribed by any medical practitioner.

e.      Fraudulently waived patient co-pays and/or co-insurances.

11

f.    Made misleading representations to 1st Class patients to induce and attempt to induce them to have more sleep studies.

g.    Conducted fraudulent and medically unnecessary sleep studies.

h.    Created and caused the creation of invoices to make it appear that 1st Class was collecting and attempting to collect co-pays and co-insurance, as required by various health care benefit programs including, but not limited to, Medicare, TRICARE, Cigna, CareFirst BlueCross BlueShield, and United Healthcare.

i.    Falsified the date of service on claims submitted to health care benefit programs, such as by backdating or postdating so the sleep study would fraudulently appear to have occurred while the patient had valid insurance.

j.    Falsified the diagnosis codes on claims submitted to health care benefit programs, in order to increase the likelihood of payment.

k.    Made unauthorized use of real physicians' names, including K.J. and M.H., on claims for services that the physicians had not actually prescribed or approved, which were submitted to health care benefit programs.

l.    Fraudulently billed services out-of-network to health care benefit programs and/or under different companies in order to increase revenue.

m.    Submitted and caused the submission to health care benefit programs of claims with false and fraudulent information, such as the diagnosis code, referring physician, date of service, service facility location, billing provider, and medical necessity.

n.    Made misleading representations to health care benefit programs.

o.     Created and used various shell companies to acquire, hold, and move proceeds from the conspiracy and scheme by and among the conspirators and their associates.

p.     Transferred and caused the transfer and disbursement of money derived from the conspiracy to purchase expensive vehicles, luxury clothing, exotic vacations, and exclusive real estate, including, but not limited to, luxury condominiums in Hawaii and Chicago, and a tract of land in the Hidden Springs neighborhood of Great Falls, Virginia, in order to construct "Le Chateau de Lumiere," a multi-million dollar and approximately 25,000-square-foot home modeled after the Palace of Versailles.

q.     Caused 1st Class to expand rapidly to multiple locations in the Eastern District of Virginia and elsewhere, with thousands of patients in their database.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS 2-7
### (Health Care Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

### I.    The Scheme

48.    From a date unknown to the grand jury but by at least 2008 through at least in or about 2014, in the Eastern District of Virginia and elsewhere, defendants YOUNG YI and DANNIE AHN, along with others known and unknown to the grand jury, did knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud and obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned and under the custody of various health care benefit programs, including Medicare, TRICARE, CareFirst BlueCross BlueShield, and United Healthcare, health care benefit programs affecting interstate commerce as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items and services, all in violation of Title 18, United States Code, Section 1347.

### II.    Manner and Means

49.    The scheme and artifice to defraud are more fully described in paragraph 47, which is realleged and incorporated as if fully set forth herein.

### III.    Claims in Furtherance

50.    On or about the below listed dates, in the Eastern District of Virginia, for the purpose of executing the scheme and artifice to defraud, and to aid and abet the same, the defendants YOUNG YI and DANNIE AHN caused the transmission of the following claims to the health care benefit programs, which were for the patients, service, and approximate amounts listed in the table below, each claim being a separate count.

14

| Count | Date Billed | Patient | Services Billed | Amount Billed | Health Care Benefit Program |
|---|---|---|---|---|---|
| 2 | 11/15/12 | E.K. | PSG | $2,400 | United Healthcare |
| 3 | 12/8/12 | C.N. | PSG | $5,000 | United Healthcare |
| 4 | 1/11/13 | F.P. | CPAP Titration | $3,000 | TRICARE |
| 5 | 1/29/13 | M.U. | CPAP Titration | $3,000 | CareFirst |
| 6 | 2/6/13 | O.L. | PSG | $2,400 | United Healthcare |
| 7 | 2/27/13 | J.B. | CPAP Titration | $3,000 | Medicare |

(All in violation of Title 18, United States Code, Sections 1347 and 2.)

## COUNT 8
### (Conspiracy to Defraud the United States)

THE GRAND JURY FURTHER CHARGES THAT:

### I.    The Conspiracy

51.    Beginning on a date unknown, but by at least in or about 2010 through at least in or about November 2011, in the Eastern District of Virginia and elsewhere, defendants YOUNG YI and DANNIE AHN did unlawfully, voluntarily, intentionally and knowingly combine, conspire, confederate and agree together and with each other and with others individuals both known and unknown to the grand jury, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Department of Treasury in the ascertainment, computation, assessment, and collection of revenue: to wit, income taxes.

### II.   Manner and Means of the Conspiracy

52.    The ways, manner, and means by which the conspirators, both individually and jointly, sought to accomplish the conspiracy included, but were not limited to, those described below:

a.   Caused entities that they owned and controlled, including 1st Class Sleep, to pay personal expenses which were falsely and fraudulently characterized as business expenses on the financial books and records of 1st Class.

b.   Caused false information, including false business records of 1st Class, to be provided to individuals for the preparation of corporate income tax returns and individual income tax returns.

c.   Caused the filing of false and fraudulent corporate tax returns.

d.   Caused the filing of false and fraudulent federal income tax returns.

e. Defendants would and did take steps to conceal the existence of the conspiracy.

## III. Overt Acts

53. In furtherance of the conspiracy, and to effect the objects and purposes thereof, the following overt acts, among others, were committed by members of the conspiracy in the Eastern District of Virginia and elsewhere:

a. On or about June 18, 2010, YI caused to be issued check number 55 made payable to cash in the amount of $600,000.

b. In or about 2010, YI and AHN, both individually and jointly, caused a $600,000 check to YI to be falsely classified as "medical supplies" on the books and records for 1st Class Sleep.

c. On or about October 20, 2010, YI caused to be issued check number 4263 made payable to YI in the amount of $580,000.

d. In or about 2010, YI and AHN, both individually and jointly, caused a $580,000 check to YOUNG YI to be falsely classified as "medical supplies" on the books and records for 1st Class Sleep.

e. On or about November 19, 2010, YI caused to be issued check number 4264 made payable to YI in the amount of $485,310.

f. In or about 2010, YI and AHN, both individually and jointly, caused a $485,310 check to YI to be falsely classified as "medical supplies" on the books and records for 1st Class Sleep.

g. On or about December 27, 2010, YI caused to be issued check number 4687 made payable to YI in the amount of $895,555.

h. In or about 2010, YI and AHN, both individually and jointly, caused an $895,555 check to YI to be falsely classified as "sales returns" on the books and records for 1st Class Sleep.

i. In or about 2010 through in or about 2011, YI and AHN, both individually and jointly, caused false information, including false business records of 1st Class, to be provided to individuals for preparation of corporate income tax returns and individual income tax returns.

j. In or about September 2011, YI and AHN, both individually and jointly, caused the filing of a false and fraudulent U.S. income tax return for an S Corporation, Form 1120S, for 1st Class Sleep Diagnostic Center, Inc. for the 2010 tax year.

k. On or about October 12, 2011, YI and AHN, both individually and jointly, caused the filing of a false and fraudulent U.S. joint individual income tax return, Form 1040, for YI and her husband, B.H.S.

(All in violation of Title 18, United States Code, Section 371.)

## COUNT 9
### (Filing a False Tax Return)

THE GRAND JURY FURTHER CHARGES THAT:

54.     On or about October 12, 2011, in the Eastern District of Virginia and elsewhere, the defendant YOUNG YI, a resident of the Eastern District of Virginia, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040 for the calendar year 2010, which was verified by a written declaration that it was made under the penalties of perjury and which she did not believe to be true and correct as to every material matter.  This Individual Income Tax Return, which was prepared and signed in the Eastern District of Virginia, and was filed with the IRS, stated that the defendant's total income was $3,809,839 (Line 22), when as she then and there knew, the amount of total income on Line 22 was substantially greater.

(All in violation of Title 26, United States Code, Section 7206(1).)

**FORFEITURE NOTICE**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE AS
DESCRIBED BELOW:

55.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, the Defendants
are notified that upon conviction of any of the offenses charged in Counts 1 through 7, they shall
forfeit to the United States any property, real or personal, which constitutes or is derived from
proceeds traceable to the violations charged herein, including but not limited to:

      a. Any real property owned by the defendant, or to entities owned or controlled by the
         defendant, including but not limited to all the lots of real property, together with its
         buildings, appurtenances, improvements, fixtures, attachments and easements, with
         the following mailing addresses:

         i. 14631 Lee Highway, Suites 401 – 412, Centreville, Virginia

         ii. 8220 Crestwood Heights Drive, Unit 107, McLean, Virginia

         iii. 20262 Redrose Drive, Sterling, Virginia

         iv. 13820 Lullaby Road, Germantown, Maryland

      b. Any interest in the following entities:

         i. Bluepoint Holding LLC

         ii. New Covenant Foundation, Inc.

      c. A sum of money equal to at least approximately $80,000,000 in United States
         currency.

56.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by 28
U.S.C. § 2461(c), the defendant shall forfeit substitute property, up to the value of the amount
described in subparagraph c, if, by any act or omission of the Defendants, the property described

above, or any portion thereof, cannot be located upon the exercise of due diligence; has been

transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the

Court; has been substantially diminished in value; has been transferred, sold to, or deposited with

a third party, or has been commingled with other property which cannot be divided without

difficulty, the United States shall forfeit substitute property up to the value of the property

described above.

(In accordance with 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7) and 28 U.S.C. § 2461(c).)


Dana J. Boente
United States Attorney

Sandra L. Moser
Acting Chief, Fraud Section

Joseph S. Beemsterboer
Deputy Chief, Health Care Fraud Unit


Katherine L. Wong
Assistant United States Attorney
U.S. Attorney's Office for the Eastern
District of Virginia

Kevin Lowell
Trial Attorney
Fraud Section, Department of Justice


A TRUE BILL:

Pursuant to the E Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

Grand Jury Foreperson